Kathleen A. BRAUN, Petitioner,

v.

Barbara POWELL, Warden, Robert E. Ellsworth Correctional Center, Respondent.

No. 97–C–0423.

United States District Court, E.D. Wisconsin.

Dec. 13, 1999.

Robert R. Henak, Fox Point, WI, for plaintiff.

Daniel J. O'Brien, (Wis. Dept. of Justice), Madison, WI, for defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

Petitioner Kathleen A. Braun seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of her Wisconsin state court conviction. On December 20, 1976, after a jury trial in Milwaukee County Circuit Court, Braun was convicted of first-degree murder as a party to the crime and sentenced to life imprisonment. In her petition for habeas corpus petitioner alleges that in the homicide trial her federal constitutional rights were violated in three respects: (1) she was denied the right to a public trial when the judge excluded a member of the public from the courtroom during trial; (2) she was denied due process because the prosecutor misrepresented to her counsel

and the jury the plea agreement with the state's principal witness, improperly cross-examined her, and made an improper statement on rebuttal; and (3) she was denied the right to confront witnesses against her when her counsel's cross-examination of two state witnesses was improperly restricted and when the court refused to give certain requested jury instructions.

## I. FACTUAL BACKGROUND[1]

In December 1973 Earl Jeffrey Seymour was arrested for the murder of a Milwaukee drug trafficker, William Weber. Weber had been shot three times, his arms severed at the wrists and his body disposed of in Cook County, Illinois. Seymour entered into an agreement with the district attorney pursuant to which he pled guilty to second-degree murder and agreed to testify against petitioner and her husband, Tim Braun.[2]

The two primary witnesses at petitioner's trial were Seymour and petitioner. Seymour, a drug dealer and user, testified that Weber threatened to stop supplying drugs to him and the Brauns. As a result, he and the Brauns decided to kill Weber. Seymour testified that on November 12, 1973 Weber went to an apartment to collect drug money. Petitioner and Seymour were at the apartment. Seymour said he led Weber into a bedroom where Kathleen Braun waited; Seymour then shot Weber once in the back and, after Weber fell to the floor, once in the heart. According to Seymour petitioner then took the gun and shot Weber in the head to make sure he was dead. Petitioner and Seymour placed the body in petitioner's car and took it to Seymour's father's home in Racine. Thereafter, the body was dismembered and transported to Illinois.

At trial, Seymour and the prosecutor described Seymour's plea agreement as involving a state recommendation of incarceration for Seymour. The prosecutor, however, had advised Seymour prior to petitioner's trial that the state's position regarding incarceration would be reconsidered after the trial. The State did reconsider, and took no position regarding incarceration at his sentencing. Seymour was sentenced to probation.

Petitioner testified at her trial and denied participation in the killing and dismemberment of Weber.

During the trial the court observed that a Mr. Mane, who had been on the venire panel but had been excused after voir dire, was present in the courtroom watching the trial. Apparently, he had been excused from service on the jury because he said that he was friendly to the defense. The court excluded him from the courtroom during the trial.

Additional facts will be set forth in my discussion of the issues in the case.

## II. POST–CONVICTION HISTORY

On December 20, 1976, petitioner was sentenced to life imprisonment for the homicide conviction. Under Wis.Stat. § 974.02 a Wisconsin defendant may, prior to appealing, move the trial court to address claims of error. *See* Howard B. Eisenberg, *Post–Conviction Remedies in the 1970s,* 56 Marq.L.Rev. 69 (1972). If the alleged error is one that the trial court could have corrected by granting a new trial, a motion for a new trial under § 974.02 is a necessary predicate for an appeal. *Thiesen v. State,* 86 Wis.2d 562, 564, 273 N.W.2d 314 (1979). On August 4, 1977, pursuant to § 974.02, petitioner filed a post-conviction motion alleging various trial errors. On December 22, 1977, before the trial court decided the motion, petitioner escaped from prison. On May 1, 1978, the trial judge orally dismissed her

---

**1.** Some of the facts are taken from the opinion of the Wisconsin Supreme Court in *State v. Braun,* 185 Wis.2d 152, 516 N.W.2d 740 (1994).

**2.** At the time of the offense petitioner's name was Kathleen Schaffer. On December 19, 1973 she married Tim Braun and took his last name. Both names are used in the trial transcript.

motion. Petitioner did not appeal the order of dismissal.

After petitioner was involuntarily returned to custody in 1984,[3] she filed a motion under Wis.Stat. § 974.06 challenging her conviction on constitutional grounds. Under § 974.06 a defendant may collaterally challenge a conviction after the time to appeal has expired. Section 974.06 is the Wisconsin equivalent of the federal habeas corpus statute; it was taken directly from 28 U.S.C. § 2255. Wis.Stat.Ann. § 974.06 cmt. L.1969.

Braun's § 974.06 motion included some claims she had included in her § 974.02 motions—including her present claims regarding her rights to a public trial and to confront witnesses—and one new claim of prosecutorial misconduct based on the failure to disclose the terms of Seymour's plea bargain. The circuit court denied petitioner's § 974.06 motion, and petitioner appealed.

Prior to deciding the case the court of appeals directed that an evidentiary hearing be held to determine the reasons underlying Judge Raskin's dismissal of petitioner's § 974.02 post-conviction motion. In response, the parties entered into the following stipulation, obviating the need for the hearing:

The state ... had filed a written motion to dismiss Ms. Braun's post-conviction motions based upon her escape from Taycheedah Correctional Institution in December 1977. Judge Raskin heard the motion on May 1, 1978. The sole basis presented by the state for dismissal of Ms. Braun's motions was her escape. At no point during the proceeding did the state argue the underlying merits of Ms. Braun's motions.

Judge Raskin orally granted the state's motion to dismiss based upon Ms. Braun's escape. At no time during the proceeding or when setting forth his order did Judge Raskin ever discuss or purport to decide the underlying merits

of Ms. Braun's motions, relying instead solely upon her escape as the basis for dismissal.

While dismissing Ms. Braun's motions, Judge Raskin orally ordered that, if Ms. Braun returned within sixty days, he would set aside the dismissal, reopen her motions, hear arguments on the merits of those motions and proceed to decide those motions on their merits. (Answer, Ex. D, App.10–11.)

The court of appeals affirmed the denial of petitioner's § 974.06 motion, holding that Judge Raskin's dismissal of petitioner's § 974.02 motion barred her from raising her claims in a subsequent § 974.06 motion. *See State v. Braun,* 178 Wis.2d 249, 504 N.W.2d 118 (Ct.App.1993).

The supreme court granted review. Petitioner did not contest the dismissal of her initial § 974.02 motion based on her escape. Rather, she argued that the dismissal of the § 974.02 motion did not bar collateral relief under § 974.06 after she was returned to custody. Petitioner argued that Judge Raskin's dismissal was not on the merits and did not finally adjudicate the issues raised. Petitioner also asserted, relying on *Bergenthal v. State,* 72 Wis.2d 740, 242 N.W.2d 199 (1976) (hereinafter *"Bergenthal"*), that even if Judge Raskin's decision was on the merits, an unappealed § 974.02 decision did not bar relief in a subsequent § 974.06 motion. In addition, petitioner argued that, in any case, one of her prosecutorial misconduct claims had not been raised in her § 974.02 motion and thus was not adjudicated by the dismissal of that motion.

The supreme court declined to consider the merits of petitioner's claims and held that (1) the dismissal of the § 974.02 motion based on her escape finally adjudicated the claims raised in that motion so as to prevent petitioner from raising them in a subsequent § 974.06 motion; and (2) with respect to the claim not raised in the origi-

---

**3.** On July 17, 1984, she was convicted of escape in Fond du Lac County Circuit Court and sentenced to two years and six months imprisonment to run consecutive to her earlier sentence.

nal § 974.02 motion she had failed to allege a "sufficient reason" pursuant to Wis. Stat. § 974.06(4) for not previously alleging it, and, therefore, based on the court's retroactive application of another decision issued the same day, *State v. Escalona–Naranjo*, 185 Wis.2d 168, 517 N.W.2d 157 (1994), review of that claim was also barred. *See State v. Braun*, 185 Wis.2d 152, 516 N.W.2d 740 (1994) (hereinafter "*Braun*").

## III. PROCEDURAL DEFAULT

 Federal habeas corpus petitioners who fail to comply with a state procedural rule while exhausting their claims in state court may be barred from raising those claims in federal court. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). However, non-compliance with a state procedural rule cannot bar federal review unless the state rule is "adequate to prevent federal collateral review." *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir.), *reh'g denied*, 108 F.3d 144 (7th Cir.1997). A state rule is adequate to prevent federal review only if it was a "firmly established and regularly followed state practice" at the time the defendant allegedly failed to follow it. *James v. Kentucky*, 466 U.S. 341, 348–51, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984). The rule must have been in place and enforced at the time of the alleged non-compliance. *Ford v. Georgia*, 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991). A rule of procedure is not adequate to prevent federal collateral review when the defendant could not be "deemed to have been apprised of its existence" at the time the rule was broken. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 457, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *accord Moore v. Parke*, 148 F.3d 705, 709 (7th Cir.1998) (federal courts "barred from reviewing a

state court decision resting on a procedural ground only if the petitioner could have known of the procedural requirement and yet still failed to follow it"). Thus, petitioner's claims are not reviewable if the state procedural rules that she failed to follow were in place at the time she violated them.

The state supreme court invoked two separate procedural rules to bar review of petitioner's claims: (1) the dismissal of petitioner's § 974.02 motion because of her escape was a final adjudication of the claims raised in that motion and barred § 974.06 review of them, *Braun*, 185 Wis.2d at 165, 516 N.W.2d 740; and (2) *Escalona–Naranjo* barred review of the prosecutorial misconduct claim because it could have been, but was not, raised on direct appeal, and Braun failed to establish a "sufficient reason" for not raising it earlier, *id.*[4]

### A. Adequacy of Procedural Rule That Dismissal of § 974.02 Motion Based on Escape Precluded § 974.06 Review

By the terms of Wis.Stat. § 974.06 itself, collateral review of a conviction under that section is unavailable in certain cases. According to subsection 974.06(4),

[a]ll grounds for relief available to a person under this section must be raised in his or her original, supplemental or amended motion. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the person has taken to secure relief may not be the basis for a subsequent motion, unless the court finds a ground for relief asserted which for suf-

---

4. Respondent suggests that petitioner's claim that the prosecutor misrepresented Seymour's plea agreement by not acknowledging that the state had agreed to reconsider its recommendation of incarceration was not different from claims raised in the initial § 974.02 motion. (*See* Resp't's Br. in Opp'n at 26 n. 4.) However, the Wisconsin Supreme Court acknowl-

edged that the claims were different and addressed them as such. Further, a review of the record indicates that the details of petitioner's prosecutorial misconduct claim presented in her § 974.06 motion and in this court are different than those raised in the initial § 974.02 motion.

ficient reason was not asserted or was inadequately raised in the original, supplemental or amended motion.

In *Braun,* the Wisconsin Supreme Court ruled that Judge Raskin's dismissal of petitioner's § 974.02 motion because of petitioner's escape "finally adjudicated," with res judicata effect, all claims raised therein. Respondent argues both that the supreme court's ruling and other clauses of subsection 974.06(4) constitute adequate bases for denying federal court review.

First, respondent argues that by escaping petitioner "knowingly, voluntarily and intelligently waived" her claim for relief in the § 974.02 proceedings, precluding § 974.06 relief under the second sentence of subsection (4). (*See* Resp't's Br. in Opp'n at 16–20.) However, neither before petitioner's escape nor even after *Braun* is there a rule in Wisconsin that by escaping a defendant waives her claims for relief. *See State v. John,* 60 Wis.2d 730, 734, 211 N.W.2d 463 (1973); *see also Braun,* 185 Wis.2d at 161–62 n. 3, 516 N.W.2d 740. In *John* the court noted only that

> [t]he difficulty with the ground of waiver is the element of knowledge of the collateral effect of an escape. True, an escapee knows he has become a fugitive from justice—this is a consequence of his act; but is it foreseeable that as a

natural result that all pending litigation will be dismissed?

*Id.*[5] Thus, when petitioner escaped no rule existed in Wisconsin that a defendant who escaped waived the right to direct or collateral review of her claims.

Second, respondent asserts, based on *State v. Brown,* 96 Wis.2d 238, 291 N.W.2d 528 (1980), that the denial of petitioner's request for § 974.06 relief was justified by the "law of the case" doctrine, which requires that "issues previously considered on direct appeal cannot be reconsidered on a motion under sec. 974.06, Stats." *State v. Brown,* 96 Wis.2d 238, 241, 291 N.W.2d 528 (1980); *see State v. Witkowski,* 163 Wis.2d 985, 473 N.W.2d 512 (Ct.App.1991). Petitioner's case, however, is clearly distinguishable from *Brown* because petitioner's § 974.02 claims were never reviewed on direct appeal. No appeal was taken.

Third, respondent contends that Judge Raskin's denial of petitioner's § 974.02 motion was itself a final adjudication barring § 974.06 review under the second sentence of subsection 974.06(4). Petitioner argues, though, that prior to *Braun* an issue was "finally adjudicated" only when decided on the merits. In support of her argument petitioner cites *Molinaro v. New Jersey,* 396 U.S. 365, 366, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970) (one justification for fugitive dismissal rule is avoidance of decision on

**5.** In the absence of Wisconsin case law suggesting waiver would occur, the answer to this rhetorical question is "no." *See Ruetz v. Lash,* 500 F.2d 1225 (7th Cir.1974) (escape does not constitute knowing decision to forego state remedies and thus does not result in waiver); *McKinney v. United States,* 403 F.2d 57, 59 (5th Cir.1968) (more than mere escape needed to establish waiver).

Waiver is "an intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great. . . ." *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). As such, waiver cannot be inferred from a silent record. *See Tague v. Louisiana,* 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980). Whatever effect Braun's escape may in fact have

had on her then pending motions, nothing about her actions suggests that she either knew or intended that the escape would act to waive her right to review of those claims.

Even if the escape reasonably could be viewed as a knowing waiver of petitioner's right to direct appeal, the assumption that she knew she would also waive her right to collateral review upon her return is wholly unreasonable. There is no evidence that she was aware of her right to collateral review much less that she intentionally gave it up. *See Williams v. Holbrook,* 691 F.2d 3, 13, 15 (1st Cir.1982) (prisoner whose first habeas petition was dismissed following her escape entitled to review of new petition following her return to custody); *Brinlee v. Crisp,* 608 F.2d 839, 857 (10th Cir.1979) (prisoner's prior escapes were not such a deliberate bypass of state procedures as to constitute a waiver of federal habeas claims).

merits); *Hall v. Alabama*, 700 F.2d 1333, 1335 (11th Cir.1983) (dismissal of appeal without opinion upon appellant's escape cannot be viewed as decision on merits); *Young v. Warden, Md. Penitentiary*, 383 F.Supp. 986, 990–91 (D.Md.1974) (allegation of error in post-conviction motion not finally litigated until court rules on merits of the allegation), *aff'd*, 532 F.2d 753 (4th Cir.1976); *State v. Wills*, 69 Wis.2d 489, 230 N.W.2d 827 (1975) (appeal of successive post-conviction motions proper where there was no written decision of trial court on prior motion from which appellate court could determine what issues had been considered and actually decided; doubts must be resolved in favor of defendant); *Estate of Pfaff*, 41 Wis.2d 159, 163 N.W.2d 140 (1968) (prior dismissal of premature appeal not res judicata because it did not reach merits); *Aiello v. State*, 166 Wis.2d 27, 479 N.W.2d 178 (Ct.App.1991) (unappealed procedural dismissals not res judicata because merits not reached); and *In re Protective Placement of J.S.*, 144 Wis.2d 670, 674 n. 2, 425 N.W.2d 15 (Ct.App.1988) (where prior appeal dismissed as moot, prior judgment not law of case). Thus, petitioner asserts, prior to both her escape and the *Braun* decision dismissal of a pending motion based on escape did not "purport to decide the underlying merits," (Answer, Ex. D, App.10), and did not finally adjudicate the issues.

Respondent replies by citing language in *John* stating that the effect of a trial court's dismissal of pending motions because of a defendant's escape is "on the merits." *John*, 60 Wis.2d at 732, 211 N.W.2d 463. In *John*, the court explored various broad justifications for dismissing a pending proceeding based on the defendant's escape, but ultimately rested its decision on the narrow ground that the convict failed to testify, preventing the court from deciding the merits of the case:

Here, the convict was unavailable to give testimony on his own behalf on a petition in which he sought relief from the court. We understand John is now incarcerated in a prison in Illinois for an offense committed while a fugitive from justice; but this situation, if important, did not exist on the day of his hearing. In failing to respond to the subpoena and give testimony when he could have, John prevented the trial court from deciding the merits of his case and thus obstructed the administration of justice. A defendant or plaintiff who fails to produce evidence, when he is ordered to do so, is in default and the case may go against him on this ground. In *Hauer v. Christon* (1969), 43 Wis.2d 147, 168 N.W.2d 81, the court recognized the inherent power of a court to dismiss a defendant's answer or a plaintiff's complaint when the party was not prepared for trial or when there was a failure to produce evidence ordered to be produced, on the ground that the necessity of the court to maintain the orderly processing of cases and the dispatch of justice required it. We think the analogy is applicable here. When a convict escapes and puts himself in a position where he cannot aid the court which needs his testimony in the determination of his petition, he has frustrated the administration of justice, made it impossible for the court to consider his petition, and has abandoned his application for relief on the merits.

*Id.* at 735–36, 211 N.W.2d 463.

Thus, although *John* did not make it entirely clear what rule it was establishing, the most reasonable interpretation of the case was that dismissals based on escape were on the merits only where the escape prevented the defendant from giving necessary testimony.[6] At a minimum, *John* fell short of announcing a rule that all dismissals based on escape were on the merits.

Respondent alternatively argues that Judge Raskin's dismissal was on the mer-

---

**6.** Petitioner's post-conviction motions presented no factual disputes requiring her testimony.

its because courts have always had inherent authority to dismiss cases based on the improper conduct of a party, and because Wis.Stat. § 805.03 empowers courts to dismiss "[f]or failure of any claimant to prosecute" and provides that such a dismissal "operates as an adjudication on the merits." *See Lawrence v. MacIntyre*, 48 Wis.2d 550, 556, 180 N.W.2d 538 (1970) (court has inherent authority to dismiss where party guilty of "undue delay or inexcusable neglect in advancing the case"). Respondent suggests that the inherent authority of courts to dismiss for failure to prosecute was itself a rule of procedure in place prior to petitioner's escape and thus was an adequate ground for barring federal review. Section 805.03, however, is a rule of civil procedure. No rule was in effect before or after *Braun* that § 805.03 authorized dismissal of a motion under § 974.02, which governs criminal cases. *See Braun*, 185 Wis.2d at 167, 516 N.W.2d 740. Further, no rule was in effect before *Braun* that the inherent authority of courts to dismiss cases under certain circumstances meant that dismissals based on escape were dismissals on the merits. If such a rule had been in effect the Wisconsin Supreme Court would not have upheld the dismissal in *John* on the narrow ground that the defendant was unavailable to testify.

Thus, prior to the time Judge Raskin dismissed petitioner's § 974.02 motion based on her escape, such a decision would not have been considered to have been on the merits. Further, before *Braun* there was no clear rule that the dismissal of a claim not on the merits could be a final adjudication having res judicata effect. Generally, under prior Wisconsin law a dismissal not based on the merits returned the parties to the position they were in prior to the dismissal. *See Pick v. Pick*, 245 Wis. 496, 499, 15 N.W.2d 807 (1944) ("dismissal of an appeal for failure to comply with statutory requirements remits the parties and the case to prior existing conditions, leaving unimpaired the statutory right to take and perfect an appeal at any time within the period provided by law").

But even if Judge Raskin's order had the effect of a dismissal on the merits, prior to *Braun* no procedural rule existed that an *unappealed* dismissal on the merits finally adjudicated a defendant's claims, barring subsequent § 974.06 relief. Indeed, prior to *Braun*—and thus both at the time petitioner escaped and the time she brought her § 974.06 motion—the question of whether an unappealed dismissal of a claim raised in a § 974.02 motion finally adjudicated the claim was controlled by *Bergenthal*.

In *Bergenthal*, the defendant at trial requested an in camera inspection of allegedly exculpatory materials possessed by the state. The court reviewed the materials, found nothing exculpatory and sealed them in an envelope for appeal purposes. On motions after verdict the defendant raised one hundred claims of error, including the trial court's failure to disclose the materials in the envelope. The trial court again reviewed the documents in camera and again ruled that they were not exculpatory.

Bergenthal appealed, raising ninety-nine of the claims of error but not the trial court's refusal to disclose the contents of the envelope. The Wisconsin Supreme Court affirmed Bergenthal's conviction. *State v. Bergenthal*, 47 Wis.2d 668, 178 N.W.2d 16 (1970). Bergenthal then brought a motion under § 974.06 challenging the trial court's failure to disclose the requested material. The supreme court rejected the state's argument that Bergenthal was precluded from raising the issue and ruled that "[e]ven though the issue might properly have been raised on appeal, it presents an issue of significant constitutional proportions and, therefore, must be considered in this motion for post-conviction relief." *Bergenthal*, 72 Wis.2d at 748, 242 N.W.2d 199; *see also Loop v. State*, 65 Wis.2d 499, 502, 222 N.W.2d 694 (1974) (defendant entitled to pursue § 974.06 collateral relief where no direct appeal filed). Prior to *Braun*, therefore, an unappealed dismissal of a § 974.02 mo-

tion did not finally adjudicate the issues raised in that motion and did not bar subsequent collateral relief under § 974.06.

██ For the foregoing reasons, I find that at the time petitioner escaped, Wisconsin did not have a procedural rule that an unappealed trial court dismissal of a post-conviction motion based on escape constituted a final adjudication of a defendant's claims barring the defendant from raising the claims in a subsequent § 974.06 proceeding. In sum, *John* was narrowly decided and did not deal with the effect of an unappealed dismissal of a § 974.02 motion on a subsequent motion for collateral relief after petitioner was returned to custody. *Bergenthal* did address the effect of a § 974.02 dismissal in a collateral proceeding and held that, if unappealed, the dismissal did not bar collateral relief. These were the cases in place at the time petitioner escaped and at the time her § 974.02 motion was denied. She could not then have been apprised of the procedural rule invoked by the Supreme Court of Wisconsin in *Braun.*

The post-conviction history of this case reinforces the conclusion that at the time petitioner escaped there was no "firmly established and regularly followed state practice" equating dismissal based on escape with final adjudication. *See James,* 466 U.S. at 348–51, 104 S.Ct. 1830. When petitioner brought her § 974.06 motion in circuit court, the state initially did not even raise the argument that as a· consequence of her escape her claims had been finally adjudicated. *Braun,* 178 Wis.2d at 254 n. 1, 504 N.W.2d 118. If the rule that a dismissal based on an escape was a final adjudication had been firmly established, the state would have brought it to the circuit court's attention. Further, if when petitioner escaped the procedural rule invoked by the Wisconsin Court of Appeals and Wisconsin Supreme Court to bar her

§ 974.06 motion was regularly followed, neither court would have found it necessary to write a substantial opinion justifying its ruling, nor would there even have been a reason for the Wisconsin Supreme Court to have granted her petition for review.[7]

This case is therefore unlike *Wood v. Hall,* 130 F.3d 373, 378 (9th Cir.1997), cited in respondent's supplemental brief. The *Wood* court held that Oregon's fugitive dismissal rule constituted an adequate ground for barring federal habeas review only because "Oregon's fugitive disentitlement rule was clear, consistently applied and well-established at the time Wood fled from the state." *Id.* at 378. In contrast, the rule invoked by the Wisconsin Supreme Court in *Braun* to bar review of petitioner's § 974.06 claims was not established at all when petitioner escaped. In fact, the supreme court created the rule in the *Braun* case.

This analysis is not intended to diminish the significance of petitioner's escape. By escaping petitioner both broke the law and flouted authority. The question before me, however, is not whether petitioner's escape should be condemned; of course, it should. Rather the question is what the state of the law was at the time she escaped. Again, for the reasons stated, I conclude that at the time petitioner escaped and at the time her § 974.02 motion was dismissed, no procedural rule was in place that the dismissal of her motion finally adjudicated all of her claims so as to bar consideration of them in a subsequent motion for collateral relief. Therefore, the rule invoked by the Wisconsin Supreme Court to bar *state* court review of the merits of her claims is not adequate to bar *federal* review of the merits of those claims.

---

7. Review by the Wisconsin Supreme Court is discretionary and generally less than 10% of petitions for review are granted. *See* Memorandum from Marilyn L. Graves, Wisconsin Supreme Court Clerk, titled *Wis.Sup.Ct. Monthly Statistical Report—December* (Jan. 4, 1999, revised Feb. 2, 1999) (on file with Wis. Sup.Ct. Clerk and available at http:// www.courts.state.WI.us/ html/SC/DEC_SC.HTM) (cumulative statistics from 1998 calendar year).

### B. Adequacy of Procedural Rule That Failure to Raise Claim on Direct Appeal Barred Relief Under § 974.06 Absent "Sufficient Reason."

■ I now address the Wisconsin courts' handling of the prosecutorial misconduct claim not raised in petitioner's § 974.02 motion. Prior to the supreme court's decisions in *Escalona–Naranjo* and *Braun,* the failure to raise an issue on direct appeal did not prevent a defendant from raising the issue in a § 974.06 motion. *Bergenthal,* 72 Wis.2d at 748, 242 N.W.2d 199 (§ 974.06 review not barred "[e]ven though the issue might properly have been raised" on direct appeal). A defendant was barred from raising an issue under § 974.06 only if she had omitted it from a prior § 974.06 motion. *State v. James,* 169 Wis.2d 490, 494, 485 N.W.2d 436 (Ct.App.1992). Petitioner had not filed a prior § 974.06 motion.

The lower courts in Wisconsin consistently followed *Bergenthal* for eighteen years. *See, e.g., id.; State v. Coogan,* 154 Wis.2d 387, 453 N.W.2d 186 (Ct.App.1990); *State v. Klimas,* 94 Wis.2d 288, 288 N.W.2d 157 (Ct.App.1979). Not until *Escalona–Naranjo,* decided the same day as *Braun,* did the Wisconsin Supreme Court overrule *Bergenthal* and reinterpret the successive petitions provision of § 974.06(4) to require a showing of "sufficient reason" for not raising claims in a direct appeal or § 974.02 motion. The Wisconsin Supreme Court applied *Escalona–Naranjo* to bar review of petitioner's prosecutorial misconduct claim because petitioner had not shown sufficient reason for not having raised it in her § 974.02 motion. The supreme court expressly tied its decision to dismiss Braun's new prosecutorial misconduct claim to its decision in *Escalona–Naranjo* to overrule *Bergenthal. Braun,* 185 Wis.2d at 166, 516 N.W.2d 740 ("we are today overruling *Bergenthal* "). Under *Liegakos,* 106 F.3d 1381, a Wisconsin court's retroactive application of *Escalona–Naranjo* cannot serve as an adequate state law ground for finding procedural default. The procedural rule invoked by the Wisconsin Supreme Court to bar review of petitioner's prosecutorial misconduct claim was not in place when she omitted it from her § 974.02 motion.

### IV. STANDARD OF REVIEW OF PETITIONER'S CLAIMS

■ Respondent contends that because petitioner's application for habeas corpus was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the new law's standard of review governs petitioner's claims. AEDPA itself does apply to Braun's petition, based on its filing date of April 21, 1997. AEDPA went into effect on April 24, 1996, and its amendments to § 2254 apply to all habeas petitions filed on or after that date. *See Lindh v. Murphy,* 521 U.S. 320, 322–23, 335, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (at 335, 117 S.Ct. 2059 stating that the amendments "unquestionably apply . . . to cases filed after the Act took effect"); *Schaff v. Snyder,* 190 F.3d 513, 521 (7th Cir.1999) (AEDPA "applies to this case because Mr. Schaff filed his federal habeas petition after the effective date of AEDPA, April 24, 1996"). Whether AEDPA's new standard of review applies is another matter, however.

AEDPA established a higher standard for habeas review by federal courts of state court convictions. Prior to AEDPA, federal courts reviewed plenarily a state court's application of federal law to the particular facts of a case and could rely on any federal precedent. *See Abrams v. Barnett,* 121 F.3d 1036, 1037–38 (7th Cir. 1997). AEDPA amended the law "by requiring federal courts 'to give greater deference to the determinations made by state courts than they were required to do under the previous law.' " *Bowles v. Berge,* 999 F.Supp. 1247, 1254 (E.D.Wis. 1998) (quoting *Emerson v. Gramley,* 91 F.3d 898, 900 (7th Cir.1996)). As amended by AEDPA, the habeas statutes now allow federal courts to grant habeas relief only if the state courts' denial of relief "was con-

trary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d);[8] see Schaff, 190 F.3d at 522 ("We may no longer rely upon our own precedent or that of other circuit courts of appeals to grant the writ. A petitioner must have a supreme court case to support his claim, and that supreme court decision must have clearly established the relevant principle as of the time of his direct appeal." (citation omitted)).

■■■ By the terms of the statutory amendments themselves, however, the new standard applies only to a "claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); see also Moore, 148 F.3d at 708 ("A prerequisite for applying [§ 2254(d) ] is that the state court adjudicated the issue before us on the merits."). Petitioner's federal constitutional claims were not "adjudicated on the merits" in state court. Respondent concedes that for purposes of § 2254(d) "neither the Wisconsin Court of Appeals nor the Wisconsin Supreme Court reached the merits of petitioner's underlying claims because her procedural default made it unnecessary to do so." (Resp't's Br. in Opp'n at 3.) The Wisconsin Supreme Court held that petitioner forfeited her right to review on the merits because her § 974.02 motion was dismissed as the result of her escape. The disposition of the last state court to issue an opinion determines whether the state has invoked a ground of forfeiture. Liegakos, 106 F.3d at 1385. Because the Wisconsin Supreme Court did not decide the merits of petitioner's claims, the standard of review in the new

§ 2254(d) is inapplicable. Id. Rather, I review the case under the general statutory directive applicable to habeas corpus cases, to "dispose of the matter as law and justice require," 28 U.S.C. § 2243, and limit my focus to errors of constitutional magnitude, United States ex rel. Swimley v. Nesbitt, 608 F.2d 1130, 1132 (7th Cir.1979).

## V. RIGHT TO PUBLIC TRIAL

### A. Trial Court's Exclusion of Member of Public From Trial

During the trial the court excluded from the courtroom a member of the public who was observing the proceedings. Petitioner argues that the exclusion violated her right to a public trial. The colloquy relating to the exclusion was as follows:

THE COURT: In taking a view of the people who are in the courtroom, as I walked into the courtroom from Chambers I saw—I don't recall his name.

MR. SHELLOW: Mane, Your Honor.

THE COURT: Mane, that's right, a cabdriver by trade, also works for the City of Milwaukee as I recall, who had been on this panel and who was stricken as a result of the voir dire conducted by counsel on both sides. It is my rule that I do not permit any juror who is on the present panel to listen to a trial in which they could have or might have been members of the jury and, therefore, I'm going to direct the bailiff and ask that Mr. Mane absent himself from the jury—from the courtroom. All right.

MR. SHELLOW: I merely point out to the Court that he asked me whether he could come in and I said yes, of course he could, that it was a public trial and that it was my—I did not understand

8. Section 2254(d) reads in full:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

that the Court had such a requirement, I obviously object to such requirement but I will tell him or you can have your bailiff tell him whatever you feel is appropriate.

MR. LOWE: I think the Court ought to be aware of the fact that at least—I think it's true—Mr. Mane probably is no longer on jury duty. I think his panel was dismissed Monday.

THE COURT: Well, I don't know whether it was.

MR. SHELLOW: I don't know what the situation is.

THE COURT: I don't know whether it was dismissed or not but I do remember particularly the State putting something on the record with respect to Mr. Mane.

MR. LOWE: Yes, we did.

THE COURT: And with respect to his friendship with counsel for the defense and later in meeting the people—the defendant and others.

MR. SHELLOW: One moment, friendship with counsel for the defense? He apparently conveyed me in his taxicab on one occasion.

THE COURT: Well, he said he was a friend of yours.

MR. SHELLOW: I don't think he was.

THE COURT: He said he knew you and anyone that knows you is a friend of yours.

MR. SHELLOW: Whatever the record reflects I object to it. I think it takes away many of my client's valuable rights.

THE COURT: You can get a writ of prohibition if you wish.

MR. SHELLOW: I can't get a writ of prohibition. I am in the middle of a jury trial, Your Honor.

(Tr. at 1110–12.[9])

The court's mention of the state's having put "something on the record" referred to a statement by the prosecutor earlier in the trial advising the court that after Mane had been excused from service on the jury panel the prosecutor saw him conversing with petitioner and Tim Braun and shaking hands with them near the courthouse. The prosecutor also said he had talked to Mane, and that Mane said he sympathized with petitioner. The prosecutor, though, also advised the court that he thought Mane had done nothing improper, and that there was no need for the court to do anything. (Tr. at 838–39.)

## B. Nature of Public Trial Right

■ The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. This right has long been recognized as applicable in state proceedings. *Argersinger v. Hamlin*, 407 U.S. 25, 27–28, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). The public trial guarantee is for the benefit of the accused. *In re Oliver*, 333 U.S. 257, 270 n. 25, 68 S.Ct. 499, 92 L.Ed. 682 (1948). The guarantee of a public trial is a safeguard against any attempt to employ the courts as instruments of persecution. *Id.* at 270, 68 S.Ct. 499. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power. *Id.* Essentially, the public trial guarantee of the Sixth Amendment embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses and jurors will perform their respective functions more responsibly in an open court than in secret proceedings. *Estes v. Texas*, 381 U.S. 532, 588, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring.) The objective is a fair trial and the public trial is an institutional safeguard to attaining it. *Id.* The right to a public trial thus belongs to the accused and is inherent in the institutional process by which justice is administered.

Obviously, the public trial guarantee is not violated if an individual member of the public cannot gain admittance to a

---

9. The pages of the trial transcript are sequentially numbered. References to the transcript, contained in the Answer at Exhibit G, will take the form of "Tr. at ___."

courtroom because there are no available seats. The guarantee will already have been met, for the "public" will be present in the form of those persons who did gain admission. Even the actual presence of the public is not guaranteed. A public trial implies only that the court must be open to those who wish to come, sit in the available seats, conduct themselves with decorum, and observe the trial process.

*Id.* at 588–89, 85 S.Ct. 1628.

In *Waller v. Georgia,* 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the supreme court held that although the right to a public trial is not absolute and must in some instances give way to other rights or interests such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information, such circumstances will be rare.

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Id.* (quoting *Press–Enterprise Co. v. Superior Ct.,* 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)).

The requirement articulated in *Waller* and *Press–Enterprise,* that trial courts may not exclude members of the public from a trial without an "overriding interest" or substantial justification, was widely recognized by courts, including the Seventh Circuit, prior to *Waller. See United States ex rel. Latimore v. Sielaff,* 561 F.2d 691, 694 (7th Cir.1977) (trial judge must have "substantial justification for excluding spectators"). The long-standing rule was that a court's discretion to order exclusion was limited to those situations where exclusion was necessary to further the administration of justice. *United States ex rel. Lloyd v. Vincent,* 520 F.2d 1272, 1274 (2d Cir.1975). And although a judge could order an exclusion if there was justifica-

tion, the exclusion order could not extend further than the special issues warranted in the particular case. *Neal v. State,* 86 Okla.Crim. 283, 192 P.2d 294, 296 (App. 1948).

■ A number of reasons have been found sufficient to justify exclusion orders. *See, e.g., United States v. Rios Ruiz,* 579 F.2d 670, 674–75 (1st Cir.1978) (uniformed officers were asked to leave courtroom during prosecution of two police officers for beatings and assaults, with caveat that they were welcome in courtroom out of uniform); *Latimore,* 561 F.2d at 694–95 (to protect witness from the trauma of reliving a sexual assault); *Lloyd,* 520 F.2d at 1274–75 (on-going undercover investigation); *United States v. Clark,* 498 F.2d 535, 537–38 (2d Cir.1974) (to protect confidential information); *Stamicarbon, N.V. v. American Cyanamid Co.,* 506 F.2d 532, 539–40 (2d Cir.1974) (protection of trade secrets); *United States v. Bell,* 464 F.2d 667 (2d Cir.1972) (discussion of skyjacker profile); *United States ex rel. Bruno v. Herold,* 408 F.2d 125 (2d Cir.1969) (to protect witness from harassment or harm); *United States v. Kobli,* 172 F.2d 919, 922 (3d Cir.1949) (to protect individuals from the presentation of evidence expected to be obscene); *State v. Genese,* 102 N.J.L. 134, 130 A. 642, 646 (Err. & App.1925) (to prevent a physical disturbance or violent situation from taking place in the courtroom); *Colletti v. State,* 12 Ohio App. 104 (1919) (where influenza epidemic required protection of public health). Thus, although a variety of reasons will justify an exclusion order, exclusions lacking any justification violate the right to a public trial.

## C. Was Right Violated?

■ Here, the trial court excluded a member of the public because he had previously served on the jury panel and because he was a friend of the defendant's lawyer and the defendant. The court made no attempt to justify excluding a member of the public because he had previously served on a jury panel. The court

also made no attempt to justify excluding a member of the public because he was friendly to the defendant or her lawyer. Moreover, the court excluded the individual on its own motion over the objection of the defendant and despite the prosecutor's statement that the individual had completed jury duty. The trial court flippantly rejected the defense counsel's statement that the spectator was not a friend of his with the statement: "He said that he knew you and anyone that knows you is a friend of yours." (Tr. at 1111–12.)

The court's exclusion of Mane was not necessary to serve any legitimate purpose. None of the justifications that courts have found sufficient to uphold exclusion orders was present. In fact, Mane's friendliness to the defense made the exclusion even more egregious. *Oliver*, 333 U.S. at 272, 68 S:Ct. 499 ("an accused is at the very least entitled to have his friends ... present"); *Commonwealth v. Marshall*, 356 Mass. 432, 253 N.E.2d 333 (1969) (constitutional error to exclude the defendant's family and friends); *Thompson v. People*, 156 Colo. 416, 399 P.2d 776 (1965) (defendant's right to public trial violated where spectators, including defendant's friends, but not including press, court officials and parties' relatives, were excluded). Even if the court had some legitimate concern, such as a concern that Mane would talk to jurors he had met while on the panel, the court could have addressed this issue in a more narrowly tailored fashion by directing Mane not to talk to the jurors. However, the court expressed no such legitimate concern. Thus, the exclusion was unjustified, overbroad and arbitrary. Further, respondent concedes both that the exclusion was unjustified, (Resp't's Supp'l Br. at 8) ("the state will not detain this court in attempting to justify his exclusion"), and that it was "arbitrary," (*id.* at 16).

While acknowledging that the exclusion was improper, respondent argues that it nevertheless did not violate petitioner's right to a public trial. First, respondent argues that because the exclusion constituted a partial, rather than a complete, closure of the trial, it is not subject to the "overriding interest" standard set forth in *Waller*. (Resp't's Supp'l Br. at 10.) Respondent points out that six circuits apply a less demanding "substantial reason" standard to partial closures. *See United States v. Osborne*, 68 F.3d 94, 99 (5th Cir.1995) (Second, Eighth, Ninth, Tenth and Eleventh Circuits in addition to Fifth have adopted "substantial reason" test). The problem with respondent's argument, however, is that the exclusion here cannot satisfy any standard, even a less stringent one. The closure was, as respondent concedes, both unjustified and arbitrary. Prior service on a jury panel does not constitute a substantial reason for excluding a member of the public from a trial. Even if there might have been a reason to exclude someone who remained on jury duty and might have been called in another case, there is no evidence that Mane remained on jury duty. The prosecutor said that he thought that Mane was no longer on jury duty, and the court made no effort to find out the facts. Nor is there a substantial reason to exclude a member of the public because he is friendly to the defendant or her lawyer. Therefore, it makes no difference whether the "overriding interest" or "substantial reason" standard applies. The exclusion was unjustified under either standard.

Second, respondent argues, based on *Brown v. Kuhlmann*, 142 F.3d 529, 537 (2d Cir.1998), that the exclusion here was insufficiently significant to violate the public trial right or, alternatively, to justify vacating petitioner's conviction. (Resp't's Supp'l Br. at 12.) *Brown* involved a brief trial closure when an undercover officer testified. The *Brown* court expressed skepticism that the closure was significant enough to impair the values furthered by the public trial guarantee but acknowledged that under supreme court precedent its skepticism was not a basis for denying relief. The court then found the closure justified based on concerns for the officer's safety and noted that even if unjustified,

the defendant's objection was "perfunctory." *Brown*, 142 F.3d at 543. Neither of the factors essential to the *Brown* decision is present here. Unlike *Brown*, the exclusion here was unjustified and the defendant objected vigorously and repeatedly.

Third, respondent argues, based on *Peterson v. Williams*, 85 F.3d 39 (2nd Cir. 1996), that the exclusion here was too trivial to violate the Sixth Amendment. (Resp't's Supp'l Br. at 12–13.) *Peterson* involved an inadvertent courtroom closure of about fifteen minutes while the defendant testified. Immediately after the closure the defendant's lawyer presented a final argument which summarized the defendant's testimony. The court held that the closure did not amount to a violation of the public trial right because it was "1) extremely short, 2) followed by a helpful summation, and 3) entirely inadvertent." *Peterson*, 85 F.3d at 44. None of the elements in *Peterson* is present here, where the exclusion lasted for the whole trial, the testimony was not summarized for the excluded member of the public, and the exclusion was deliberate, not inadvertent.

 In addition, the Seventh Circuit's discussion of the maxim de minimus non curat lex suggests that the exclusion cannot be regarded as trivial. In *Hessel v. O'Hearn*, 977 F.2d 299, 304 (7th Cir.1992), the court characterized the maxim as denoting "types of harm, often but not always trivial, for which the courts do not think a legal remedy should be provided." A violation of the public trial right does not fall into this category. Further, according to the analysis of the leading work of scholarship on the de minimis maxim as recognized by the Seventh Circuit, *id.* at 303, the concept of triviality would not be appropriately applied here. In their article, *De Minimis Non Curat Lex*, 45 Mich. L.Rev. 537 (1947), Max L. Veech and Charles R. Moon analyze various factors courts consider in determining whether to apply the maxim. The most important factor is the purpose behind the doctrine to be interpreted. *Id.* at 545. The purpose of the public trial guarantee is to ensure that members of the public are not unjustifiably excluded from trials—precisely what occurred here. Thus, to hold that the exclusion here was trivial would undermine the purpose of the guarantee. The second factor to consider in connection with the de minimis maxim is practicality. *Id.* at 551. This factor, too, favors not applying the maxim here. There are no practical impediments to applying the public trial guarantee in this case. The third factor mentioned by Veech and Moon is intent. *Id.* at 554. The authors point out that an innocent mistake is always more readily excused than an intentional one. This factor, too, suggests that I should not treat the exclusion here as trivial. The judge's order was not innocent or inadvertent but intentional, entered after discussion with the parties and over the objection of the defendant.[10]

 Fourth, respondent asserts that the exclusion did not violate the public trial guarantee because the press and other spectators attended the trial. (Resp't's Supp'l Br. at 14.) However, courts have long recognized that the right to a public trial bars the arbitrary picking and choosing of who may attend. *See Addy v. State*, 849 S.W.2d 425 (Tex.App.1993). As early as 1891 the Michigan Supreme Court held that it was error to exclude all but "respectable citizens." *People v. Murray*, 89 Mich. 276, 50 N.W. 995, 998 (1891). In *State ex rel. Stevens v. Circuit Court for Manitowoc County*, 141 Wis.2d 239, 250–51, 414 N.W.2d 832 (1987), the Wisconsin Supreme Court held that the right to a public trial was violated where the proceedings were arbitrarily closed to some members of the public, even though the media was allowed access. *See also Davis v. United States*, 247 F. 394, 395 (8th

---

**10.** The final two factors in the Veech and Moon analysis are mutuality and value, neither of which is applicable here.

Cir.1917) (trial court's exclusion of spectators other than relatives of the accused, members of the bar and members of the press denied right to public trial; court stated that "a public trial is a trial at which the public is free to attend"); *United States ex rel. Bennett v. Rundle,* 419 F.2d 599 (3rd Cir.1969) (right to public trial violated by order excluding persons other than defendant, lawyers, witnesses, and court officers). The foregoing decisions and many others make clear that the unjustified exclusion of some members of the public but not others violates the public trial guarantee.

Fifth, respondent argues that petitioner "makes no attempt to show why Mr. Mane's attendance would have assisted the defense." (Resp't's Supp'l Br. at 14.) However, no cases suggest that the excluded person's ability to help the defense is relevant to whether the public trial guarantee was violated.

Sixth, respondent argues that the exclusion was narrow and therefore did not violate the public trial guarantee. Respondent again cites no cases where unjustified exclusions were nevertheless upheld because only one member of the public was excluded. Respondent cites only cases where exclusions were found to be justified or where no one was excluded. *See, e.g., United States v. Galloway,* 963 F.2d 1388 (10th Cir.1992) (partial closure justified based on court's findings of fact regarding sexual assault victim); *Snyder v. Coiner,* 510 F.2d 224, 230 (4th Cir.1975) (where bailiff without knowledge of judge refused to allow persons to enter or leave courtroom during counsel's arguments in order to prevent disturbance and where condition existed for short time and was quickly changed by court when advised of bailiff's action); *Brandon v. State,* 839 P.2d 400, 412–13 (Alaska App.1992) (exclusion of assault defendant's mother during testimony of defendant's six year old child was justified based on findings of judge); *People v.*

*Woodward,* 4 Cal.4th 376, 14 Cal.Rptr.2d 434, 841 P.2d 954, 958–59 (1992) (exclusion justified by interest in maintaining court security and orderly courtroom proceedings).[11]

■ Finally, respondent argues that "the only one who suffered any actual harm from the trial court's order was Mr. Mane himself." (Resp't's Supp'l Br. at 15.) However, as has been noted, the public trial guarantee is for the benefit of the accused. *Oliver,* 333 U.S. at 270 n. 25, 68 S.Ct. 499. Whatever harm the excluded spectator suffered is irrelevant to whether the defendant's right was violated.

In sum, none of respondent's arguments as to why an admittedly arbitrary and unjustified exclusion nevertheless does not violate the public trial guarantee is persuasive. Because the exclusion was unjustified it violated petitioner's constitutional right to a public trial.

### D. Remedy for Violation of Right to Public Trial

Petitioner contends that the appropriate remedy for a violation of the public trial right is a new trial. Respondent disagrees, arguing that: (1) the only available remedy belongs to the excluded spectator, (Resp't's Supp'l Br. at 16); (2) petitioner's remedy was to bring a writ of prohibition, (*id.* at 21); (3) *Waller* does not require that a conviction be vacated because of a public trial violation, (*id.* at 18); and (4) even if *Waller* does require reversal of a conviction, the rule may not be applied retroactively to petitioner's conviction, which became final before *Waller* was decided, (*id.* at 23). Instead, respondent argues that I should apply harmless error analysis and under such analysis find exclusion of the spectator to be harmless.

■ Respondent's arguments that only the excluded member of the public had a

---

11. Both *Woodward* and *Snyder* noted that there was valid justification for requiring any new spectators to wait until a recess to enter the courtroom during closing arguments.

Both also observed that unlike here, no one was required to leave the courtroom, and *Woodward* expressly limited its holding to non-evidentiary proceedings.

remedy and that petitioner's remedy was to bring a writ of prohibition are not supported by case law and need not be discussed further.[12] I now turn to respondent's *Waller*-related arguments.

### 1. Remedy Required by *Waller*

*Waller* involved the improper closure of a suppression hearing, not a trial. With respect to the appropriate remedy the court stated:

> The parties do not question the consistent view of the lower federal courts that the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee. We agree with that view, but we do not think it requires a new trial in this case. Rather, the remedy should be appropriate to the violation.... A new trial need be held only if a new, public suppression hearing results in the suppression of material evidence not suppressed at the first trial, or in some other material change in the suppression of material evidence not suppressed at the first trial, or in some other material change in the positions of the parties.

*Waller*, 467 U.S. at 49–50, 104 S.Ct. 2210 (footnote omitted).

Respondent argues that *Waller* contradicts itself by stating both that a defendant need not prove prejudice in order to obtain relief but also that the remedy must be appropriate to the violation. (Resp't's Supp'l Br. at 18–19). Respondent then proposes that I reconcile this "contradiction" by reading *Waller* as requiring a new trial for public trial violations involving partial closures only where the defendant was "deprived of the safeguards of the public trial." (Resp't's Supp'l Br. at 19–21.) However, none of the three cases respondent cites supports its argument that a defendant must show prejudice to obtain relief for an unjustified partial closure. *Woodward*, 14 Cal.Rptr.2d 434, 841

P.2d at 958–59, involved an exclusion justified by "substantial reasons." In *State v. Rusin*, 153 Vt. 36, 568 A.2d 403, 406 (1989), the trial court was also found to have had sufficient reason for excluding certain spectators. And *Renkel v. State*, 807 P.2d 1087, 1093 (Alaska App.1991), held only that the level of justification necessary to permit closure must take into consideration whether the closure is total or partial. In fact, because the partial closure in *Renkel* was unjustified, no proof of prejudice was required and the conviction was reversed. *Id.* at 1093–94.

Moreover, I disagree with respondent's contention that *Waller* contradicts itself. *Waller* holds that prejudice is presumed from a public trial violation and that the remedy for such violation must be commensurate with the violation itself. Accordingly, if the violation occurred at a pretrial hearing, but not at the trial, a new trial may not be appropriate. *See, e.g., Waller*, 467 U.S. at 49–50, 104 S.Ct. 2210; *Bennett*, 419 F.2d at 608–09; *State v. Webb*, 160 Wis.2d 622, 467 N.W.2d 108 (1991). The previously closed hearing may be ordered reheld in public. Under *Waller*, only in such cases of non-trial closures is the reviewing court entitled to conduct a "proportionality" or harmless error analysis as proposed by respondent. *Waller*, however, does not permit such an analysis for exclusions that occur during the trial itself unless there is another way of restoring the public nature of the trial. An example of a case where a violation affected the trial but where the public nature of the trial could be restored is *United States v. Canady*, 126 F.3d 352 (2d Cir.1997). There, the judge violated the defendant's right to a public trial by issuing a written decision after a criminal trial. However, the public nature of the trial could be restored by the judge pronouncing the decision publicly. If the violation affects the trial itself, however, and there is no other

---

12. A defendant may pursue the extraordinary remedy of a writ of prohibition. *See Stevens*, 141 Wis.2d 239, 414 N.W.2d 832. However, I am aware of no case *requiring* a defendant to petition for extraordinary relief or holding that the failure to do so constitutes a waiver of the right to a public trial.

way to restore the public nature of the trial, then the only proportional remedy is a new trial. *Waller* does not contradict itself; therefore this court will not create an exception to the rule established by the United States Supreme Court in *Waller* that prejudice neèd not be proven in cases of public trial violations.

 *Waller* provides that the remedy for a public trial violation is to vacate the conviction and order a new trial, not only where the harm in a particular case is sufficiently egregious to justify that result, but in any case where the public trial right is violated and the public nature of the trial cannot be restored by another remedy. The defendant is not required to show specific prejudice as a condition of having the conviction vacated and receiving a new trial. Here, there is obviously no way by which the public nature of the trial can be restored. I know of no order that could be entered to undo the trial court's unwarranted exclusion of a member of the public. Thus, if the rule set forth in *Waller* is applicable here, I must issue the writ, invalidating petitioner's conviction.

### 2. Was *Waller* Rule New?

Respondent argues that the rule set forth in *Waller* that a defendant need not prove harm to obtain relief was a "new rule," which under *Teague v. Lane*, 489 U.S. 288, 299–316, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), may not be retroactively applied to invalidate petitioner's conviction because it became final prior to *Waller*. Rather, respondent argues, prior to *Waller* a public trial violation was subject to harmless error analysis. (Resp't's Supp'l Br. at 23.)

 In *Teague*, the Supreme Court adopted a new approach to the retroactive application in habeas corpus proceedings of newly announced legal rules. The *Teague* doctrine is that, with two exceptions, a new rule will not be retroactively applied in federal habeas corpus proceedings to void a conviction that was final when the new rule was announced. *Id.* at 301, 109 S.Ct. 1060.[13] The purpose of the *Teague* doctrine is to prohibit "the continuing reexamination of final judgments based upon later emerging legal doctrine." *Sawyer v. Smith*, 497 U.S. 227, 234, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990).[14] The first exception permits retroactive application of a new rule if the rule places certain private conduct beyond the power of the state to proscribe. *Teague*, 489 U.S. at 307, 109 S.Ct. 1060. The second exception permits retroactive application of new rules that ·create "watershed" rules of criminal procedure. *Id.*

A federal court applying the nonretroactivity doctrine proceeds in three steps:

First, the court must ascertain the date on which the defendant's conviction and sentence became final for *Teague* purposes. Second, the court must "[s]urve[y] the legal landscape as it then existed" and "determine whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution." Finally, even if the court determines that the defendant seeks the benefit of a new rule, the court must decide whether that rule falls within one of the two narrow exceptions to the nonretroactivity principle.

*Caspari v. Bohlen*, 510 U.S. 383, 390, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) (citation

13. The *Teague* doctrine was codified and expanded by Congress when it enacted AEDPA. *See* 28 U.S.C. § 2254(d). However, as previously discussed, that portion of AEDPA is inapplicable to the present case. *See supra* part IV.

14. The plurality in *Teague* and the post-*Teague* majority have repeatedly given retroactive application to *Teague's* own unequivocally novel rule. *See, e.g., Sawyer*, 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193; *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Thus although *Teague* was decided after petitioner's conviction became final *Teague* is nevertheless applicable.

omitted) (quoting *Graham v. Collins,* 506 U.S. 461, 468, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993)); *accord Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

 Thus, the first step in determining whether petitioner is seeking the benefit of a new rule is to determine when petitioner's conviction became final for *Teague* purposes. The supreme court has stated that "by final we mean where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed before the decision" in the case which allegedly pronounces the new rules. *Allen v. Hardy,* 478 U.S. 255, 258, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986). Petitioner was found guilty and sentenced on December 20, 1976. On August 4, 1977, she filed timely post-conviction motions pursuant to § 974.02. On December 22, 1977, she escaped. On May 1, 1978, the trial judge dismissed her § 974.02 motions but indicated that if she returned in sixty days he would set aside the dismissal and decide the motions on their merits. Petitioner, however, did not return within sixty days and did not appeal the dismissal order. Therefore, for purposes of the *Teague* analysis petitioner's conviction became final when the sixty day grace period afforded by the trial court elapsed, on July 1, 1978. *Waller* was decided by the United States Supreme Court in 1984.

 The next step in the *Teague* analysis is to determine whether the *Waller* rule was new. A case announces a new rule "when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague,* 489 U.S. at 301, 109 S.Ct. 1060. In *Teague,* the supreme court sought to validate reasonable good-faith interpretations of existing precedents made by state courts even though shown to be contrary to later decisions. *Butler v. McKellar,* 494 U.S. 407, 415, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990). A rule is not "new" if the state court "would have felt compelled by existing precedent to conclude that the rule

[petitioner] seeks was required by the Constitution." *Saffle,* 494 U.S. at 488, 110 S.Ct. 1257. Factors relevant to this inquiry are whether existing precedent spoke to the issue and how other courts had ruled on the question at the time the petitioner raised the issue. *See id.* at 490, 110 S.Ct. 1257; *Walton v. Caspari,* 916 F.2d 1352, 1359 (8th Cir.1990). Thus, I survey the legal landscape as it existed on July 1, 1978, and determine whether a defendant whose public trial right was violated would have had to prove prejudice to obtain relief.

### a. Existing Precedent

At the time petitioner's conviction became final there was unanimity among the courts that had addressed the issue that a defendant was not required to prove specific prejudice to obtain relief for a violation of the public trial guarantee. In *Waller* the Supreme Court noted this consistent view of the lower federal courts:

> *See, e.g., Douglas v. Wainwright,* 714 F.2d 1532, 1542 (11th Cir.1983) (citing cases), *cert. pending,* Nos. 83–817, 83–995[468 U.S. 1206, 104 S.Ct. 3575, 82 L.Ed.2d 874 (1984), 468 U.S. 1212, 104 S.Ct. 3580, 82 L.Ed.2d 879 (1984)]. *See also Levine v. United States,* 362 U.S. 610, 627, 80 S.Ct. 1038, 4 L.Ed.2d 989 n. (1960) (Brennan, J. dissenting); ("[T]he settled rule of the federal courts [is] that a showing of prejudice is not necessary for reversal of a conviction not had in public proceedings."). The general view appears to be that of the Court of Appeals for the Third Circuit. It noted in an en banc opinion that a requirement that prejudice be shown "would in most cases deprive [the defendant] of the [public-trial] guarantee, for it would be difficult to envisage a case in which he would have evidence available of specific injury." *United States ex rel. Bennett v. Rundle,* 419 F.2d 599, 608 (3d Cir.1969). While the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers

plainly thought them nonetheless real. *See also State v. Sheppard*, 182 Conn. 412, 418, 438 A.2d 125, (1980) ("Because demonstration of prejudice in this kind of case is a practical impossibility, prejudice must necessarily be implied."); *People v. Jones*, 47 N.Y.2d 409, 418 N.Y.S.2d 359, 391 N.E.2d 1335 (1979) ("The harmless error rule is no way to gauge the great, though intangible, societal loss that flows" from closing courtroom doors.).

*Waller*, 467 U.S. at 49 n. 9, 104 S.Ct. 2210. Other pre-July 1, 1978 federal cases reaching the same conclusion included: *Kobli*, 172 F.2d at 921 ("[V]iolation of the constitutional right necessarily implied prejudice and more than that need not appear. Furthermore, it would be difficult, if not impossible, in such cases for a defendant to point to any definite, personal injury. To require him to do so would impair or destroy the safeguard." (citations omitted)); *Tanksley v. United States*, 145 F.2d 58 (9th Cir.1944) (defendant victimized by violation of public trial right not required to show that he was prejudiced); *Davis*, 247 F. at 398–99 (violation of public trial right implies prejudice and more than that need not appear, it would be difficult if not impossible for defendant to show prejudice).

Significantly, Seventh Circuit precedent was to the same effect. *See Latimore*, 561 F.2d at 694 ("Because the public trial guarantee not only prohibits secrecy but also reflects a preference for an open forum, prejudice to the defendant is implied whenever the trial judge lacks substantial justification for excluding spectators, and an affirmative showing of harm is unnecessary to establish a violation of the defendant's right to public trial." (citations omitted)). While Seventh Circuit precedent is not technically binding on a Wisconsin appellate court, *see Freeman v. Lane*, 962 F.2d 1252, 1258 (7th Cir.1992) (citing *United States ex rel. Lawrence v. Woods*, 432 F.2d 1072, 1075 (7th Cir.1970)), a Seventh Circuit decision interpreting a rule of constitutional criminal procedure is a significant precedent because it is binding on a federal district court in Wisconsin in a habeas corpus proceeding challenging a state conviction.

Moreover, state law at the time that petitioner's conviction became final was the same as federal law. *See, e.g.,* H.D. Warren, Annotation, *Exclusion of public during criminal trial*, 156 A.L.R. 265, 296 (1945) ("But at least in cases where error is made in excluding the public or portions thereof from a trial, and the accused objects upon that ground, it has been held that it must be presumed that the error was prejudicial, and that the burden is not upon the accused to show in what particular prejudice resulted." (citing cases [15])); *see also* H.H. Henry, Annotation, *Exclusion of public during criminal trial*, 48 A.L.R.2d 1436, 1454 (1956) ("Where a trial court has erred in excluding the public or a portion thereof from the courtroom during a criminal trial and the accused has made timely objection to such exclusion, it has generally been held that prejudice will be presumed without the burden being placed upon the accused to show actual prejudice.") (and cases discussed therein [16]). Although no pre–1978 Wisconsin case addresses the issue, the Wisconsin Constitution, like the Sixth Amendment, guarantees the right to a "public trial." Wis. Const. art. 1, § 7.

Respondent fails to cite a single pre-*Waller* case applying harmless error analysis to a public trial violation. *Levine v.*

---

**15.** *Wade v. State*, 207 Ala. 1, 92 So. 101 (1921); *People v. Hartman*, 103 Cal. 242, 37 P. 153 (1894); *Tilton v. State*, 5 Ga.App. 59, 62 S.E. 651 (1908); *People v. Murray*, 89 Mich. 276, 50 N.W. 995 (1891); *State v. Keeler*, 52 Mont. 205, 156 P. 1080 (1916); *State v. Hensley*, 75 Ohio St. 255, 79 N.E. 462 (1906); *State v. Osborne*, 54 Or. 289, 103 P. 62 (1909);

*State v. Jordan*, 57 Utah 612, 196 P. 565 (1921).

**16.** *People v. Byrnes*, 84 Cal.App.2d 72, 190 P.2d 290 (1948); *People v. Rivers*, 410 Ill. 410, 102 N.E.2d 303 (1951); *People v. Jelke*, 308 N.Y. 56, 123 N.E.2d 769 (1954); *Neal v. State*, 86 Okla.Crim. 283, 192 P.2d 294 (1948).

*United States,* 362 U.S. 610, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960), relied upon by respondent in its state court briefs, did not hold otherwise or permit a harmless error analysis. *Levine* was a due process waiver case. *See id.* at 617, 619, 80 S.Ct. 1038. Because Levine did not request that the proceedings be opened, he was not denied due process. *Id.* Harmless error was neither applied nor discussed. The absence of "deliberately enforced secrecy" or "prejudice attributable to secrecy" was raised solely in relation to the court's inability to find adequate reason to overlook the defendant's failure to object to the closure. *Id.* at 619–20, 80 S.Ct. 1038. The decision did not question the established principle that upon proper objection violation of the public trial right requires reversal without a showing of prejudice.

No case supports respondent's contention that prior to *Waller* "it was reasonable to assume that a violation of the public trial right would be subject to harmless error analysis." (Resp't's Supp'l Br. at 23.) Although *Reagan v. United States,* 202 F. 488, 490 (9th Cir.1913), includes a statement supportive of respondent's position, that statement was treated as dictum by a subsequent Ninth Circuit decision well before petitioner's conviction became final. *See Tanksley,* 145 F.2d at 58; *see also United States v. Hernandez,* 608 F.2d 741, 748 (9th Cir.1979) ("If it is determined that the trial court improperly excluded the public, prejudice necessarily is implied, and it is not required that an accused make any showing of harm from the exclusion of the public since it would be difficult, if not impossible, to show any definite personal injury. To require the accused to establish prejudice because of the exclusion would impair or destroy the safeguard." (citations omitted)). Although several state cases have suggested that they might require a showing of specific prejudice, no case actually holds this and in the cases suggesting it there were other reasons for denying relief. It appears unlikely that in any such case the court would have refused a new trial solely for this reason. *See* Note, *The Right to a Public*

*Trial in Criminal Cases,* 41 N.Y.U.L.Rev. 1138, 1149 n. 80 (1966).

Thus, when petitioner's conviction became final existing federal and state precedent interpreting the Sixth Amendment's public trial guarantee supported her contention that she need not show specific prejudice to obtain relief for a public trial violation.

### b. Rationale of Existing Precedent

In determining whether a Wisconsin appellate court would have felt compelled by existing precedent to conclude that the Constitution required the rule sought by petitioner, it is also important to look at the reasoning of the decisions on the question. The reason that courts invariably gave for refusing to apply harmless error analysis to public trial violations was that in most, if not all, cases defendants would be unable to prove prejudice and to require such proof would impair or destroy the right to a public trial itself. *See, e.g., Bennett,* 419 F.2d at 608 ("But a defendant who invokes the constitutional guarantee of a public trial need not prove actual prejudice. Such a requirement would in most cases deprive him of the guarantee, for it would be difficult to envisage a case in which he would have evidence available of specific injury."); *Davis,* 247 F. at 398 (it would be difficult if not impossible in such cases for a defendant to point to any definite personal injury; to require such proof would destroy the safeguard); *Kobli,* 172 F.2d at 921 (same); *Tanksley,* 145 F.2d at 59 (same).

Scholarly commentary made the same point:

> [I]t is the duty of the state to provide a trial at which certain minimal standards are respected and it should not relieve itself of this obligation by requiring the accused to show how he was harmed by its misconduct.

> [I]f actual prejudice were required the public trial guaranty might become illusory for many defendants.... The protections accorded to the accused by a

public trial and intangible are not easily measurable. A similar problem arises in right to counsel cases, where it is difficult for an appellate court to determine retrospectively what benefits might have been secured by the presence of counsel. In both situations, a showing that the proceeding was one in which the defendant was *entitled* to his constitutional guaranty and that the guaranty was denied should be sufficient to warrant reversal.

Note, *The Right to a Public Trial in Criminal Cases*, 41 N.Y.U.L.Rev. 1138, 1149–50 (1966) (footnotes omitted). Another commentator said:

> In fact, one can scarcely conceive of a defendant being able to show actual prejudice in a given case. As pointed out by Professor Wigmore "no tangible and positive advantage is gained for a party in a given case by publicity or lost by privacy." ... If the defendant has no complaint unless he can show prejudice, where is the ground for reversal because of such an order?

Francis T. Goheen, *Trials, Right to "Public Trial"—Power of Judge to Exclude General Public*, 35 Mich.L.Rev. 474, 478 (1937).

Thus, the force of the no harmless error rule as a constitutional corollary of the public trial guarantee was not based solely on the number of decisions embracing the rule, but in the widespread recognition both in case law and legal scholarship that no other rule consistent with maintaining the guarantee was possible.

### c. Respondent's Arguments That Rule Was New

Respondent argues that the rule set forth in *Waller* was a "clear break" with the past. (Resp't's Supp'l Br. at 30.) In view of the then existing precedent this claim is untenable.

Respondent also argues that *Waller* established a new rule because *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which held that federal constitutional errors were generally subject to harmless error analysis, did not identify public trial violations as being among the exceptions to the general rule. (Resp't's Supp'l Br. at 26.) However, *Chapman* made no attempt to comprehensively list all exceptions to the general rule. Footnote 8 in *Chapman*, 386 U.S. at 23, 87 S.Ct. 824, which mentions three exceptions to the general rule begins with the words, "*See, e.g.*" "E.g." means "for example," *Black's Law Dictionary* 533 (7th ed.1999), and signifies that the subsequent enumeration of rights is illustrative and not exhaustive. Further, the court made no attempt to list precedent in the lower federal courts and state courts.

Respondent also makes a general policy argument that the *Teague* nonretroactivity principle should apply. However, to apply the rule petitioner seeks is not inconsistent with *Teague*. The idea behind *Teague* was to prevent federal courts from nullifying state court judgments when at the time of those judgments the state courts were applying established rules of law. Respondent cannot reasonably assert detrimental reliance on prior law because *Waller* did not change the law. *Waller* did not impose a new obligation on the states because no state or federal jurisdiction had adopted a contrary rule. Then, as now, the adoption of a rule applying harmless error analysis to public trial violations would not have been reasonable. *Lambrix v. Singletary*, 520 U.S. 518, 538, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997).[17]

### d. Other Decisions on *Waller*/*Teague* Relationship

Finally, all decisions of which I am aware that have addressed the retroactivi-

---

**17.** Respondent also argues that I should look to the impact of retroactive application on the administration of justice. Based on the amount of time that has elapsed since Judge Raskin's service and the unlikelihood that any parties objected to any similar orders, if there were any, it is extremely unlikely that any cases comparable to this one potentially exist.

ty issue, both before and after *Teague*, have held either that *Waller* did not create a new rule or that *Waller* should be applied retroactively. *See Daniel v. Kelly*, No. CIV–78–830E, 1990 WL 130523, *6 (W.D.N.Y. Aug.31, 1990) (*Waller* rule that exclusion must be justified not new rule within *Teague* ); *Jones v. Henderson*, 683 F.Supp. 917, 920 (E.D.N.Y.1988) ("This Court finds that *Waller* does not constitute a change in the law in the sense that it introduces a new substantive constitutional right which provides for a result contradictory to one that would otherwise be required."); *Santos v. Brown*, 596 F.Supp. 214 (D.R.I.1984) (public trial right fundamental, therefore retroactive). These cases recognize both the significance of the public trial guarantee and that in *Waller* the Supreme Court acknowledged an interpretation of it that had long been agreed on by jurists on other courts.

### e. Conclusion

 Based on the foregoing, I find that *Waller* did not set forth a new rule; at the time petitioner's conviction became final the Wisconsin courts would have felt compelled to conclude that petitioner did not need to show prejudice to obtain relief for the public trial violation.

### 3. Applicability of Second *Teague* Exception

 Even if *Waller* did create a new rule the rule applies retroactively if it is within one of the *Teague* exceptions. The first exception involving decriminalization of previously proscribed conduct is clearly inapplicable. The second exception covers rules "implicit in the concept of ordered liberty." *Teague*, 489 U.S. at 307, 109 S.Ct. 1060. This exception is for " 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle*, 494 U.S. at 495, 110 S.Ct. 1257 (quoting *Teague*, 489 U.S. at 311, 109 S.Ct. 1060). Perhaps the core attributes of rules that are retroactive under this exception are those without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *Rose v. Clark*, 478 U.S. 570, 577–78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).

The public trial right and the rule that an aggrieved defendant need not show prejudice to obtain relief clearly fall within this category. In *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the Supreme Court held that the deprivation of the constitutional right to a public trial is a structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. The court further characterized the right as one central to the accurate determination of guilt or innocence. *Id.; see also Neder v. United States*, 527 U.S. 1, ——, 119 S.Ct. 1827, 1833, 144 L.Ed.2d 35 (1999) ("indeed we have found an error to be structural and thus subject to automatic reversal, only in a very limited class of cases" (internal quotation marks omitted)). Thus, the *Waller* rule that a defendant need not prove prejudice to obtain relief for a public trial violation is a core attribute of a fair trial and retroactive under the second *Teague* exception. One court put the matter as follows:

> The aims and interests of the accused's rights to a public trial, in ensuring the public sees that he is fairly dealt with and not unjustly condemned, and in encouraging witnesses to come forward, and in discouraging perjury, are mainstays of integrity in the fact finding process. For these reasons and because of the fundamental nature of the Sixth Amendment right to a public trial, the Court holds the *Richmond[Newspapers v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980)] and *Waller* principles . . . to merit . . . retroactive application.

*Santos*, 596 F.Supp. at 219. *See also Williams v. State*, 736 So.2d 699, 701, 704–05 (Fla.App.1999) (denial of public trial concerns fundamental error, harmless error rule does not apply to closure of courthouse doors).

## E. Conclusion Regarding Public Trial Issue

It is not easy to vacate a twenty-three year old homicide conviction because the trial court unjustifiably excluded one member of the public from the trial. However, the right vindicated by this decision is an important one. The public trial and its key attributes—that the trial must be open to any member of the public who wishes to observe it as long as there is an available seat and the person behaves with decorum—is a critical feature of our criminal justice system. And while the principal purpose of the guarantee is to protect the accused, as an institution the public trial advances policies that benefit all. Some of these policies, such as the importance of ensuring public awareness of criminal proceedings and of maintaining judicial impartiality, are as vital today as they were when the Constitution was adopted. *See generally* Stephen Steward Madsen, *The Right to Attend Criminal Hearings,* 78 Colum.L.Rev. 1308, 1324 (1978). The trial court's exclusion of Mr. Mane was a blatant violation of the Constitution. Because the public trial right is a substantial right grounded in the universal acceptance of the significance of an open court the defendant is entitled to a new trial without having to show specific prejudice. Under the law I have no choice but to issue petitioner a writ of habeas corpus on this basis.

Although the great writ must issue on the basis stated above, for purposes of completeness in the event of an appeal I also will address petitioner's remaining arguments to see if they justify relief.

## VI. PROSECUTORIAL MISCONDUCT

Petitioner contends that a writ should issue because the prosecutor committed a variety of acts of misconduct that cumulatively denied her a fair trial and violated her right to due process of law. Specifically, petitioner contends that the prosecutor misrepresented the terms of the key prosecution witness's plea agreement, improperly cross-examined petitioner, and misled the jury in his rebuttal argument.

### A. Applicable Law

In cases where prosecutorial misconduct is alleged, the "touchstone of due process ... is the fairness of the trial not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 220, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The question is whether the prosecutorial misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), *quoted in Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). It is not enough that the prosecutor's conduct was undesirable. *Id.* Rather, the misconduct must poison the atmosphere of the trial to such a degree that it would be unfair to permit the conviction to stand. *Lieberman v. Washington,* 128 F.3d 1085, 1097–98 (7th Cir.1997). In determining the impact of the prosecutor's behavior the fairness of the trial in its entirety must be examined. *Shepard v. Lane,* 818 F.2d 615, 621 (7th Cir.1987). Prosecutorial misconduct does not warrant a new trial unless it "undermined the fairness of the trial and contributed to a miscarriage of justice." *United States v. Hall,* 165 F.3d 1095, 1115–16 (7th Cir.) (quoting *United States v. Young,* 470 U.S. 1, 16 n. 14, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)), *cert. denied,* —— U.S. ——, 119 S.Ct. 2381, 144 L.Ed.2d 784 (1999).

Further, under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as extended by *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the defendant's right to due process is violated if the prosecutor suppressed evidence favorable to the defense that was material to an issue at trial. *United States v. Earnest,* 129 F.3d 906 (7th Cir.1997). Evidence is material to the defense if there is a reasonable probability that if the evidence had been

disclosed to the defense the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682, 685, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Hamilton*, 107 F.3d 499, 509 (7th Cir.1997). A reasonable probability is that sufficient to undermine confidence in the outcome. *Id.* Additionally, due process requires full disclosure of the terms of agreements struck with a witness and an opportunity for full cross-examination regarding such agreements. *United States v. Fallon*, 776 F.2d 727, 734 (7th Cir.1985).

**B. Misrepresentation of Seymour Plea Agreement**

■ Petitioner argues that during the trial the prosecutor misrepresented the plea agreement the prosecutor had entered into with chief witness Seymour. Specifically, petitioner contends that the prosecutor represented the agreement as requiring a state recommendation of incarceration for Seymour's second degree murder conviction when in fact the state had previously informed Seymour that its position regarding incarceration would be reconsidered after petitioner's trial. The state's commitment to recommend incarceration was, in fact, reconsidered after the trial, and at Seymour's sentencing hearing the prosecutor praised Seymour's performance as a witness and made no specific sentence recommendation. The judge sentenced Seymour to probation. Petitioner argues that the state violated her due process rights by failing to disclose to defense counsel its promise to reconsider its incarceration recommendation, by misrepresenting the agreement in opening and closing arguments, and by permitting Seymour to misrepresent the agreement in his testimony.

The record discloses that the prosecutor was less than candid about his agreement with Seymour. During the trial the prosecutor represented that pursuant to the plea bargain with Seymour he would recommend to Seymour's sentencing judge that Seymour be incarcerated for his second degree murder conviction. (Tr. at 822–24, 5770.) Seymour generally testified to the same effect. (Tr. at 1431–32, 1597–98.) Apparently, not until Seymour was sentenced did petitioner's counsel discover that before petitioner's trial the prosecutor had agreed to reconsider the incarceration recommendation. Even at Seymour's sentencing hearing the prosecutor was evasive on what he had actually agreed to. Seymour's lawyer had to correct the prosecutor with respect to the terms of the bargain:

> MR. LOWE [prosecutor]: ... [I]t was indicated to Mr. Seymour that it would recommend incarceration, but it would not be specific as to a particular term of incarceration. The plea was entered and accepted by the Court, the Court heard the testimony in support of it, and heard litigation regarding the sentencing. Does the Court have any other questions?

> THE COURT: No, I have none.

> MR. LOWE: Are there any corrections or alterations that Mr. Sutton or Mr. Seymour would like to add at this point? If there was anything that I said incorrect or inprecise [sic]?

> MR. SUTTON: I would like to amend something. After I became attorney for Mr. Seymour, and some negotiation conferences were held with the District Attorney's Office, and particularly with Mr. Lowe, and in the course of those conferences Mr. Lowe did agree that the State's position with regard to incarceration would be reconsidered, although no comment was made as to what the result of the reconsideration would be after the trial was concluded in the matter of the State versus Kathleen Braun, and after that trial—in the last ten days as a matter of fact—a conference with Mr. Lowe was held and he indicated that the State would now as a part of the plea bargain and a part of negotiations that were ongoing, was now of the position of not objecting to whatever disposition the Court might make with regard to the sentence, and we no longer require or

affirmatively state a preference for incarceration.

With that amendment, everything that Mr. Lowe has said has been completely accurate.

THE COURT: Mr. Lowe, any comment on that?

MR. LOWE: Yes, I believe that is an accurate statement. Let me for this record clarify exactly what that is. Specifically, with regard to any ongoing negotiations, there was only alteration of any kind from the original plea bargain, which said alteration involved a statement to Mr. Sutton and the defendant that the State would take into consideration all of the defendant's circumstances subsequent to November 12th, 1973, and then make whatever recommendation it felt was appropriate based on all of the circumstances surrounding the defendant's conduct, his rehabilitation, and so forth, between the time of the offense and the time of the sentencing.

That originally was not part of the original plea bargain, simply because we stated at the time of the original plea bargain, and the understanding was that we would ask for incarceration. The alteration of that original commitment was that we said we would take into consideration all of the circumstances and make whatever recommendation we felt was appropriate at the time of sentencing. Now as of last week, Tuesday, I believe, and that would have been January 25th, Mr. Sutton and Mr. Seymour were in my office for the purpose of clarifying what position we would finally have before this Court.

At that point, after discussing the matter with Mr. Seymour and his attorney, the State made the following statement as to his position, and this is probably an alteration of the original agreement—I think it is. The State's recommendation at this time, and the

agreement between Mr. Sutton, myself and Mr. Seymour is as follows.

We wish to inform the Court that since the time of the plea bargain agreement being originally negotiated, Mr. Seymour has continually cooperated with the District Attorney's Office; that he has done everything that we have asked him to do and he has appeared at every meeting we have asked him to appear at. He has, in our judgment, testified truthfully and honestly in the preliminary hearing and in the trial regarding Kathleen Schaefer, and in the preliminary hearing regarding Timothy Braun.

Mr. Seymour may have to testify again, depending upon the circumstances surrounding Timothy Braun—that's set for trial before the Honorable Max Raskin in April. As the Court knows, this was not an easy case to prosecute, nor was it an easy case to defend. I'm now speaking about the case of Kathleen Schaefer, and Timothy Braun. Mr. Seymour has been prompt in all of his appearances and has as I said continued to cooperate with us doing anything we have asked him to do.

The State, on that basis, feels that the sentencing is a prerogative solely within the discretion of the Court. We feel that taking into consideration all of the surrounding circumstances of Mr. Seymour's conduct since the time of the offense until today's date, that sentencing be left up to this Court without any recommendation from the State. But that this prosecutor feels that whatever disposition this Court will give to this case, it would not be objected to by this prosecutor.

(R. 20, Ex. A at 5–8.[18]) I find that the prosecutor, by not disclosing to counsel or to the jury that he had agreed to reconsider the incarceration recommendation, sup-

**18.** During the course of the federal habeas proceeding, petitioner requested that the record be supplemented to include certain documents from the state record. References to those documents will take the following form: "R. ___, Ex. ___."

pressed information favorable to petitioner and made misrepresentations to the jury.

The hard question is whether the prosecutor's failure to disclose was material. As stated above, to be material there must be a reasonable probability that if the prosecutor had disclosed the plea agreement the outcome of the trial would have been different. *Bagley*, 473 U.S. at 682, 685, 105 S.Ct. 3375; *Hamilton*, 107 F.3d at 509. The materiality standard is not met by "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Hamilton*, 107 F.3d at 509.

Here, it is *possible* that a full disclosure might have affected the outcome of the trial. Seymour was critical to the state's case because he was the only witness who connected petitioner to the murder. His importance as a state witness is evidenced by the fact that the state permitted him to be sentenced to probation for committing a murder. However, I must consider the prosecutor's failure to disclose in the context of the entire record. Although it is not an easy question, considered in light of the whole record I do not believe that if the prosecutor had been forthright there is a reasonable probability that the outcome of the case would have been different.

The prosecutor's lack of candor was mitigated by the fact that Seymour, during his testimony, made two statements to the jury suggesting that the incarceration recommendation was not cast in stone. On direct examination he testified that the "District Attorney's office said that they would take into consideration everything that I have done since the murder to the time of sentencing and make whatever recommendation they feel appropriate at that sentencing." (Tr. at 1432.) And on cross-examination he again testified that at the sentencing the district attorney was free to make "whatever recommendation he felt was proper." (Tr. at 1632.) These state-

ments enabled defense counsel to argue on summation:

> And now we know what happened. Earl Jeffrey Seymour, professional practicing sociopath, practicing psychopathic liar, bright, witty, sharp, ugly, contradicting himself whenever he cares to, riding whatever he has got on it but basically a young man trying to live the rest of his life with his family and saying here, God, just let her be convicted, just this one time, and I will never ask anything else of anybody. Just let me get this conviction and let me get out on my second degree murder, and let them give me probation and whatever, God let me get away from all of this.

(Tr. at 6010.)

Further, petitioner's counsel cross-examined Seymour for a long time, approximately a week. He was able to probe Seymour's motivation for becoming a state's witness. He brought out much information casting doubt on Seymour's credibility based on his deal with the state, including the following possible direct results: Seymour could receive probation for his second-degree murder conviction, (Tr. at 1581); he could be eligible for parole, even if given prison time for the second-degree murder, in only six months, (Tr. at 1582), while eligibility for parole on a first-degree murder conviction would have been eleven years, (Tr. at 1579); Seymour could have faced mandatory life imprisonment for first-degree murder, but instead would face only a twenty-five-year maximum sentence for second-degree murder, (Tr. at 1578); and the prosecutor agreed to make an "appropriate" recommendation at Seymour's sentencing, taking everything into account since the murder, (Tr. at 1432, 1632). In addition, petitioner's counsel brought out that Seymour would not be prosecuted for armed burglaries and theft committed by him at the homes of the victim and two others, (Tr. at 1697–99); would not be prosecuted for drug dealing between 1970 and 1973, (Tr. at 1703); would not be charged with auto theft or

arson in connection with two cars taken by him after killing Weber, (Tr. at 1708–09); and would not be charged with perjury for lying at his own previous murder trial, which ended in a mistrial, (Tr. at 1709–10). Seymour acknowledged that he had been out on bail on the homicide charge for two years as of the date of petitioner's trial. (Tr. at 1730.)

Seymour testified that he had committed several other illegal prior acts and that many of them were not going to be prosecuted as part of his deal, all of which the jury could have used to assess his trustworthiness as a witness. He admitted, for instance, being involved in a hit-and-run accident after the murder, fleeing the scene because he was concerned that police might find evidence of the murder in his car, (Tr. at 5398–99, 5407–08); committing many burglaries and thefts over the years (for which he would not receive jail time), (Tr. at 1782–85); importing two hundred pounds of marijuana into Milwaukee (for which he was not going to be prosecuted), (Tr. at 1680–85); possessing illicit drugs while in the county jail awaiting his guilty plea, (Tr. at 1644–46); arranging for someone to send him hacksaw blades while in the jail, (Tr. at 1646); and committing a new drug offense in Racine only hours after being released on bail in his own case after reaching the plea agreement with the state, (Tr. at 1717–21).

Seymour admitted that he was a drug user, even taking LSD while at Waupun Correctional Institution, (Tr. at 1651–52); ran drugs across the border into the United States from Mexico (he claimed on the stand that he was a "double agent" for the Mexican government), (Tr. at 2174); and admitted using aliases while working with Tim Braun importing drugs from Mexico, (Tr. at 2160–62, 2174, 2185–86, 2189–90). Medical reports diagnosed Seymour as a sociopath and a drug addict. (Tr. at 2252–54, 5368–70.)

Petitioner's cross-examination of Seymour drew out other evidence regarding Seymour's self-interest in testifying against petitioner. Seymour knew that both the petitioner and Tim Braun accused him of being an informant. (Tr. at 2365–55.) And a series of letters Seymour wrote in the county jail to his cousin a few months before his guilty plea suggested that the cousin find a "surprise witness" who would testify that the petitioner or Tim Braun actually shot Weber and were trying to frame Seymour. (Tr. at 4855–63.)

Regarding his own credibility, Seymour testified that he lied under oath at his own murder trial and several other times, (Tr. at 2238, 2340–47), including once to a judge about his use of LSD in jail, (Tr. at 1792–94). Seymour admitted he lied to police when he told them the victim sold cocaine to him, (Tr. at 2249), and that he failed to mention at his own trial his contention that he and petitioner killed Weber because Tim Braun threatened to kill him if he did not, (Tr. at 2132–33). Seymour said he told doctors in 1973 that he was hallucinating when actually he was not. (Tr. at 2264–66, 2309–10.)

 It is hard to conclude that having heard all this information about Seymour the jury would have assessed his credibility differently had it known the undisclosed details of the prosecutor's changed recommendation. The jury had before it plenty of evidence that Seymour was an unsavory, lying, drug-using criminal.

Petitioner contends that even though her counsel impeached Seymour with all of these facts, the concealed nature of the plea agreement was qualitatively different because it provided Seymour with an incentive to lie. But the jury had extensive other evidence suggesting that Seymour was trying to help himself by helping the state. While I do not wish to downplay the serious failure on the part of the prosecutor, the materiality standard is a high one, and in the context of the whole trial I do not believe it has been met.

### C. Cross–Examination of Petitioner

 Petitioner argues that when she was on the stand the prosecutor asked her

questions that insinuated she had given prior contrary statements when the prosecutor knew she had not. According to petitioner, the prosecutor asked "When did you recall seeing the money put in a desk drawer?" (Tr. at 5234); "When did you recall seeing that?" (*id.*); and "When did you remember that you wanted to drive the Triumph?" (Tr. at 5235), improperly suggesting that she had previously indicated she did not recall such things. Petitioner also argues that the prosecutor asked other questions insinuating facts he knew were untrue. For instance, the prosecutor asked questions implying that petitioner left Milwaukee because she knew the victim's body had been found, when he knew there was no publicity concerning discovery of the body until after her departure. (Tr. at 5340.) He also asked a question suggesting that petitioner married to take advantage of an evidentiary privilege: "What suddenly moved or prompted you to get married after your arrest in Elko, Nevada? It couldn't have been the fact that a husband can't testify against a wife, could it?" (Tr. at 5363.) [19] Petitioner also objects to the prosecutor's sarcastic follow-up question: "Well, what suddenly prompted this romance in the desert?" *Id.*

■ It is improper for a prosecutor to ask defense witnesses questions of the "when did you stop beating your wife?" variety and to suggest facts to a jury that the prosecutor knows are untrue. *See, e.g., United States v. Silverstein*, 737 F.2d 864, 867–68 (10th Cir.1984). A prosecutor may strike hard blows, but not foul ones. *Young*, 470 U.S. at 7, 105 S.Ct. 1038. Some of the prosecutor's questions suggest insensitivity to this distinction. Nevertheless, any inartfully phrased questions did not so infect the trial with unfairness that the conviction cannot stand. The trial lasted over eight weeks and the transcript exceeds 6,300 pages. The offending questions take up a small percentage of the

transcript. In some instances, such as the question why petitioner married Tim Braun, defense counsel's objection was sustained and a curative instruction immediately given. Also, the questions concerned subject matter appropriate to cross-examination, e.g., whether petitioner left Milwaukee because of concern about being implicated in the crime. Additionally, petitioner was able to explain her answers on redirect. In the context of the entire record the prosecutor's sometimes inappropriate questions did not deny petitioner due process of law.

**D. Prosecutor's Rebuttal**

■ In closing argument, Braun's attorney questioned why three persons who could have corroborated portions of Seymour's testimony were not called as witnesses by the state: the state failed to call Dennis Webster to corroborate Seymour's testimony that Webster was the source of the gun obtained by Tim Braun, Tim Braun's federal probation officer to corroborate Seymour's testimony that Tim was to see the probation officer to establish an alibi, and Weber's landlady to corroborate Seymour's testimony that she saw Seymour and petitioner after the murder when they burglarized Weber's apartment.

The prosecutor acknowledged to the court outside the presence of the jury that he did not call Webster or the landlady because they would not have corroborated Seymour's testimony. (Tr. at 5924–28.) In his rebuttal, however, the prosecutor argued:

> Now, Mr. Shellow also mentions the fact that—he mentions the name of a man named Dennis Webster. He talks about a landlady. He talks a[sic] federal probation officer. I will only state this:
>
> Those people were contacted by the state—
>
> . . . .

---

**19.** The husband-wife privilege in Wisconsin does not bar a husband from testifying against his wife but merely bars testimony concerning "private communication by one to the other made during their marriage." Wis. Stat. § 905.05.

And for whatever reasons the State didn't produce them, we weren't trying to hide them from you. We are not trying to secrete them from you, but there are several reasons why witnesses don't get called to testify in criminal trials. Among them are lack of memory, lack of cooperation, whatever the reason. You can't think of the reasons and [sic] these witnesses are not called to testify.

(Tr. 6014–15.) Petitioner contends that the prosecutor's rebuttal was improper because it encouraged the jury to speculate about facts not in evidence, it impermissibly vouched for Seymour's credibility, and it asserted or suggested the existence of facts known to be false.

■ A prosecutor may not inject his personal opinion on the credibility of a witness or insinuate that he possesses undisclosed evidence supporting a witness's credibility. *See, e.g., United States v. Creamer,* 555 F.2d 612, 617 (7th Cir.1977), (citing *Lawn v. United States,* 355 U.S. 339, 359–60 n. 15, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958)). The prosecutor's statement did not expressly vouch for Seymour's credibility, however.

■ Prosecutors, though, are permitted only to "make arguments reasonably inferred from the evidence presented." *United States v. Vargas,* 583 F.2d 380, 385 (7th Cir.1978). Here, there was no evidence in the record about whether the state had contacted these individuals or about why they did not testify. Thus, the prosecutor's argument did improperly exceed what could reasonably have been inferred from the evidence, thus encouraging the jury to speculate. Moreover, he misled the jury to infer *false* facts because he knew that none of the three individuals suffered from lack of memory or refused to cooperate with the prosecutor.

■ While the argument was improper, it did not render the entire trial unfair. The fact that the state did not call these witnesses does not mean that Seymour's testimony was false. Also, the uncorroborated testimony did not directly relate to

whether petitioner committed the crime, but related only to marginal issues. Webster would have disputed that he provided Tim Braun with a gun but not what Tim, Seymour or petitioner did with a gun, wherever they got one. The landlady would have said that she didn't remember seeing Seymour and petitioner on the day of the murder, which might have benefitted petitioner but probably only minimally.

The prosecutor's misstatement on rebuttal was a relatively isolated remark relating to marginal issues. In the context of the entire record it was of insufficient magnitude to constitute a denial of due process.

**E. Conclusion Regarding Prosecutorial Misconduct**

To cause the great writ to issue, the prosecutor's missteps must have infected the trial with unfairness, *Stewart v. Duckworth,* 93 F.3d 262, 267 (7th Cir.1996), or, put slightly differently, must have poisoned the atmosphere of the trial, *United States v. Pirovolos,* 844 F.2d 415, 425 (7th Cir.1988). The most serious failing here was the prosecutor's lack of candor with respect to the terms of Seymour's plea bargain which, as I have indicated, nevertheless did not warrant relief. The prosecutor's questioning of petitioner and his statement on rebuttal may have been improper, but they were relatively isolated remarks which, in the context of the whole trial, were not of great significance. This was a long, hard fought trial in which petitioner was vigorously and aggressively defended. In light of the whole trial, the instances of prosecutorial misconduct did not cause a miscarriage of justice or make the proceeding so unfair as to deny petitioner due process of law under the established standard.

**VII. RIGHT TO CONFRONT WITNESSES**

Petitioner argues that her Sixth Amendment right to confront witnesses was denied because the trial court did not give

her adequate opportunity to cross-examine Seymour and another witness, Richard Anthuber.

 The Sixth Amendment guarantees that "[i]in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. This right to effective cross-examination is fundamental to a fair trial. *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In order for cross-examination to be effective the fact-finder must be presented with sufficient information concerning a witness's bias. *United States v. De-Gudino,* 722 F.2d 1351, 1354 n. 4 (7th Cir.1983). Where a court restricts cross-examination the question is whether a reasonable jury might have received a significantly different impression of the witness's credibility had the cross-examination not been restricted. *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Where a witness invokes the Fifth Amendment, the right of confrontation may be violated if the witness's invocation creates a substantial danger of prejudice by denying the defendant the ability, through cross-examination, to test the truth of the witness's direct testimony. *United States v. Lyons,* 703 F.2d 815, 818–19 (5th Cir.1983).

 A confrontation clause error of either type is subject to harmless error analysis. *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431. In a habeas proceeding the standard for determining whether a trial error was harmless is whether the error "had substantial and injurious effect or influence in determining the jury's verdict," resulting in actual prejudice to the defendant. *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). On collateral review the error in question need not be harmless beyond a reasonable doubt; but if in applying the above standard I am "in grave doubt about the likely effect of an error on the jury's verdict," the trial error should be deemed harmful. *O'Neal v. McAninch,* 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). I must conduct a de novo review to "evaluate the error in the context of the entire trial record" and "consider all the ways that error can infect the course of the trial." *Brecht,* 507 U.S. at 641–42, 113 S.Ct. 1710.

## A. Cross–Examination of Seymour

 Petitioner argues that she was denied the right to fully cross-examine Seymour. The court restricted her counsel's attempts to go into Seymour's expectations regarding his sentence and his then existing understanding of his plea agreement. Further, although petitioner's counsel was able to ask Seymour whether he committed perjury at his prior trial for Weber's murder, the court sustained objections to the questions, "and how many times did you commit perjury?" and "how many questions were asked of you at that trial that you knowingly answered falsely?" (Tr. at 1710–11.) Additionally, defense counsel elicited that Seymour had taken LSD but the court did not permit further exploration of the issue and restricted questioning about pending federal marijuana charges against Seymour. Petitioner also objects to the trial court's permitting Seymour to invoke the Fifth Amendment regarding the federal drug charges without first inquiring into the legitimacy of his self-incrimination concerns. Petitioner then makes a related argument that the trial court should not have rejected her requested jury instructions directing the jury to assess Seymour's credibility in light of his hopes and expectations of leniency at his sentencing. (Tr. 5674–76, 5696–5700, 5710; *see* R. 20, Exs. B, C, and D.)

 The trial court need not have restricted petitioner's attempt to elicit Seymour's understanding of his plea agreement or his hopes concerning sentence. Restrictions on such questions as how many times Seymour testified falsely were also unnecessary. Nevertheless, petition-

er's counsel was permitted extensive cross-examination. The cross-examination lasted about a week and consumed over 750 pages of transcript. (Tr. at 1551–2366.) As discussed previously, petitioner's counsel brought out much unattractive material about Seymour. Petitioner's counsel was generally able to probe Seymour's biases and his motive to lie. He was able to bring out that Seymour was aware that he could receive probation for second-degree murder and that the prosecutor would make an appropriate sentencing recommendation based on all of Seymour's recent activities, including his service as a witness. He elicited that Seymour lied under oath. Seymour ultimately responded to questions about the federal marijuana charges, (Tr. at 1674–79), and answered questions about importing drugs, (Tr. at 1679–88). The trial court's restrictions were not sufficiently severe or extensive to deny petitioner's Sixth Amendment right to confrontation. Had petitioner's counsel's cross-examination not been restricted it is improbable that a reasonable jury would have received a significantly different impression of Seymour's credibility. Further, if the court's restrictions did rise to the level of constitutional error, under the harmless error standard the error was harmless.

■■■ Petitioner's corresponding argument is that the jury should have heard her specific instructions about the potential for Seymour to lie on the stand to save himself.[20] Instead, the court gave a more general theory instruction, which noted defendant's theory that Seymour testified falsely in part due to his hope that such testimony would favorably affect his sentence. (Tr. at 6065–66.) The court's instruction, particularly in view of petitioner's counsel's summation, which strongly emphasized that Seymour lied to save his own skin, surely put the jury on notice that if the jury determined that Seymour was not credible, petitioner should be acquitted. The court's refusal to give the particular instructions requested by petitioner was not constitutional error.

## B. Cross–Examination of Richard Anthuber

■■■ Petitioner also argues that the trial court denied her right of confrontation by restricting her cross-examination of

20. The trial court refused to give the following requested instructions:
> Defendant's Requested Instruction No. 58: A witness who has pleaded guilty to a serious crime, but who has not been sentenced may have hopes and expectations that the sentence which he will receive will either depend upon the testimony which he gives or upon the outcome of the case in which he has testified. In weighing the testimony of such a witness, you may consider the extent to which these hopes or expectations of leniency have influenced his testimony.
(R. 20, Ex. B.)
> Defendant's Requested Instruction No. 79: A witness who has pleaded guilty to a serious crime and who has not been sentenced may expect that the District Attorney will recommend leniency if he testifies in accordance with the prosecutor's theory. While sentencing remains in the discretion of the Court, many judges listen to both the prosecutor and defense counsel in determining what sentence should be imposed.
> Earl Jeffrey Seymour has pleaded guilty to second degree murder. Upon such a plea he can be sentenced either to probation or to twenty-five years or any length of imprisonment less than twenty-five years. You may consider his hopes and expectations in determining what weight to give to his testimony.
(R. 20, Ex. C.)
> Defendant's Requested Instruction No. 98: In weighing the testimony of a witness who has received something of value in exchange for that testimony, the question always is whether what has been received by the witness is sufficiently important to him to cause him to testify falsely.
> It is thus not only [w]hat the witness has already received which must be considered by the jury, but what the witness expects to receive. It is the state of mind of the witness while he is on the witness stand which must be weighed by the jury in determining whether the testimony of the witness has been affected by what he has received and what he expects or hopes to receive in the future.
(R. 20, Ex. D.)

Richard Anthuber. Anthuber testified on direct that Seymour made statements prior to his arrest that implicated Seymour and petitioner in the murder. On cross, petitioner's counsel attempted to show that Anthuber was biased in favor of the state by establishing that six months earlier the prosecutor trying petitioner's case had recommended that Anthuber be sentenced to probation on an unrelated drug case despite his being a serious drug offender. Anthuber thereafter became a state's witness against petitioner. The prosecutor objected to petitioner's attempt to bring out the prosecutor's favorable recommendation, because he claimed that the recommendation was based on Anthuber's prior informant activity unrelated to petitioner's case. The court sustained the prosecutor's objection. The prosecutor emphasized the corroborative nature of Anthuber's testimony in his closing argument.

The trial court's restriction on petitioner's counsel's cross-examination of Anthuber may have been unnecessarily restrictive. The jury might have inferred from Anthuber's having recently benefitted from a state sentencing recommendation that he was biased in favor of the state.

However, evaluating the error in the context of the entire record, it did not have substantial and injurious effect on the jury's verdict. Thus, it was harmless. Some parts of Anthuber's testimony were favorable to petitioner, including his testimony that she denied being involved in the murder or being aware of Seymour's having cut up a body. Anthuber gave the jury some of the information petitioner wanted by acknowledging that he was a heroin dealer, that he had been placed on probation six months previously, and that the prosecutor in petitioner's case appeared at his recent sentencing hearing. Moreover, in the context of the whole case Anthuber was a relatively minor player. Although he corroborated some of Seymour's testimony so did other witnesses to whom Seymour made similar statements. (Tr. at 2388–93, 2398–99, 2829–31, 2850, 2878–79, 5406.) Thus, the trial judge's restriction on petitioner's counsel's effort to go into the previous state recommendation of probation in Anthuber's case was not so serious as to make the trial unfair.

## VIII. ORDER

Based on the foregoing,

**IT IS HEREBY ORDERED** that petitioner's application for a writ of habeas corpus is **GRANTED** based upon the violation of her right to public trial. The issuance of the writ will be stayed for 180 days to permit the state the opportunity to retry her.